UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| K.K., by and through her next friend J.K., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 19-005-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CLARK COUNTY BOARD OF | ) | **MEMORANDUM OPINION** |
| EDUCATION, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

K.K. has alleged various civil rights and tort claims, by and through her next friend J.K., ("the plaintiff" or "K.K.") against Defendants Becca Boyd, Kris Creteau, and the Clark County Board of Education ("the Board"). Boyd, Creteau, and the Board have filed a motion for partial summary judgment regarding Plaintiff K.K.'s federal claims. [Record No. 36] Boyd and Creteau also have filed a separate motion for partial summary judgment on the state law claims brought against them in their individual capacities. [Record No. 31] Collectively, the defendants seek summary judgment on all remaining counts. After reviewing the record and the parties' arguments, the Court agrees that the defendants are entitled to judgment on all claims.

# I.

K.K. was a Seventh Grade student at Robert D. Campbell Junior High School in Clark County, Kentucky. Clark County Public Schools has a Safety Tipline, Online Prevention ("S.T.O.P.") program that is run through the Kentucky Center for School Safety and the

- 1 -

Kentucky Department of Education. The tip line is designed for individuals in the community, students, or parents to anonymously provide information about unsafe situations, including abuse, to school personnel.

An October 2, 2018, S.T.O.P. tip stated that K.K. and her sister were being physically abused by their father. [Record No. 31-2, p. 2] The tip explained that the kids were told to lie by their father because the state would take them away if they talked about their abuse. [*Id.*] Clark County Director of Pupil Personnel Greg Hollon was monitoring the tip line when the S.T.O.P. tip came in on October 2. After communicating with state social services, Hollon forwarded the tip in an e-mail to school personnel for further verification because social services could not follow-up on the tip without the students acknowledging the abuse or showing visible signs of trauma. [*Id.* at 1.]

Seventh Grade Counselor Becca Boyd and Seventh Grade Assistant Principal Kris Creteau investigated the tip pursuant to Hollon's e-mail. Boyd called K.K. into her office to discuss the matter. [Record No. 31-3, p. 1] The door was shut, and the office window's blinds were completely closed. [*Id.*] Boyd asked K.K. about school and her goals. [Record No. 31-4] Boyd relayed to the child the report that she was being physically abused at home and conducted a visible check of K.K.'s arms and face while the plaintiff was speaking. [*Id.*]

Creteau then entered the office. She again explained the anonymous tip and asked if anyone was hurting K.K. [Record No. 31-3] K.K. responded that no adult in her life was hurting her and affirmed that she would be comfortable telling them if someone was abusing her. [*Id.*]

Creteau told K.K. that they needed to check for bruises or cuts on her body. [*Id.*] K.K. pulled her jeans up to show no bruises on her lower legs. [*Id.*] Boyd asked her to pull her shirt

up to her bra line so they could look at her stomach and back.  [*Id.*]  Creteau then asked if she was comfortable to show them her thighs, and K.K. said yes.  [*Id.*]  Boyd told her to pull her pants down but keep her underwear in place.  [*Id.*]  K.K. complied with these requests.  [*Id.*]  Creteau noted there were no bruises or cuts on her thighs, stomach, or back.  [*Id.*]  K.K. then discussed her custody situation with Creteau and Boyd and informed them of a protection order in place against her mother.  [*Id.*]

Creteau called Hollon and conveyed their findings.  [*Id.*]  Hollon said that she should let K.K.'s father know that there would be no further action on the part of the school.  [*Id.*]  K.K.'s father came to pick her up from school, and Creteau explained to him and K.K. that the school would take no further action.  [*Id.*]

K.K. testified that she cried during the investigation.  [Record No. 31-6, p. 17]  She further reported that numerous students and former classmates questioned or harassed her online and through texts about the October 2 incident after they heard about the pending litigation.  [*Id.* at pp. 12-13]  This led to her deleting several social media accounts.  [*Id.*]  Although K.K. reports feeling increasingly self-conscious about her body, she has not seen a counselor or therapist concerning any emotional distress she experienced as a result of the incident.  [*Id.* at pp. 14-15]  Further, K.K.'s grades did not suffer after the investigation.  [Record No. 31-9]

K.K., by and through her next friend, J.K., filed this lawsuit on January 10, 2019, asserting violations of her Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983, as well as various state law claims.  [Record No. 1]  The defendants filed a prior motion for partial summary judgment to dismiss the Count III's (federal) failure to train claim and the state law claims asserted against them in their official capacity.  [Record No. 24]  The Court

subsequently dismissed K.K.'s claims for negligence (First Count IV), invasion of privacy (First Count IV), grossly negligent infliction of emotional distress (Second Count IV), and intentional infliction of emotional distress (Count V) against Boyd and Creteau in their official capacities. [Record No. 29] Additionally, her claim for failure to train (Count III) was dismissed in its entirety. [*Id.*]

Boyd, Creteau and the Board have now moved for partial summary judgment on the remaining federal law claims: a § 1983 claim against Boyd and Creteau (in their individual and official capacities), as well as the Board alleging a violation of the Fourth Amendment of the United States Constitution (Count I); a § 1983 claim against Boyd and Creteau (in their individual and official capacities) alleging deliberate indifference in violation of the Fourteenth Amendment of the United States Constitution (Count II); and another § 1983 claim against Boyd and Creteau (in their individual and official capacities) for deliberate indifference to the plaintiff's constitutional rights (Count VI). [Record No. 36] Boyd and Creteau have also moved for partial summary judgment on the remaining state law claims asserted against them in their individual capacities: violations of the Constitution of Kentucky (First Count IV); negligence (First Count IV); invasion of privacy (First Count IV); grossly negligent infliction of emotional distress (Second Count IV); and intentional infliction of emotional distress (Count V). [1] [Record No. 31] These two motions collectively request summary judgment on all remaining counts. [*See* Record Nos. 29, 31, and 36.]

---

[1] The Defendants' motions for summary judgment also seek dismissal of claims for punitive damages. [Record Nos. 31-1, p. 19 and 36-1, p. 17] The defendants do not explain this request, and while the plaintiff pleaded punitive damages throughout the Complaint, she did not assert punitive damages as a separate ground for relief. [Record No. 1] But even if she had done so, she would not be entitled to relief on a lone allegation of punitive damages because, as the Court has explained before, "punitive damages is not a separate cause of action, but a remedy

## II.

Summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co*., 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes,* 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely on the assertions in its pleadings; rather, it must come forward with probative evidence to support its claims. *Celotex*, 477 U.S. at 324. In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co*., 475 U.S. at 58.

---

potentially available for another cause of action." *Cutter v. Ethicon*, No. 5:19-443-DCR, 2020 WL 109809, at *10 (E.D. Ky. Jan. 9, 2020) (quoting *Petrey v. Ethicon, Inc.*, No. 5: 19-298-DCR, 2019 WL 5295185, at *3 (E.D. Ky. Oct. 18, 2019) (quotation omitted)).

### III.

The defendants contend in one motion for partial summary judgment that they are entitled to judgment regarding the remaining federal claims, all of which involve § 1983. [Record No. 36]  The Court agrees, and judgment will be entered in favor of Boyd, Creteau, and the Board on Counts I, II, and VI.

**A.    The Claims Asserted Against the Board and the School Officials in their Official Capacities Fail as a Matter of Law.**

The defendants assert they are entitled to judgment as a matter of law on all § 1983 claims asserted against the Board, including Counts I, II, and VI.[2]  Only Count I of the remaining counts explicitly alleges a cause of action against the Board.  [Record No. 1, pp. 3-4].  However, Counts II and VI are deliberate indifference claims asserted against school personnel in their official (as well as personal) capacities.  [*Id.* at pp. 4-5, 7-8]

When a plaintiff alleges a cause of action against government actors in their official capacities, she seeks damages from the government entity itself.  *Jones v. Perry Cty. Fiscal Ct.*, 185 F. Supp. 3d 947, 959-60 (E.D. Ky. 2016) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993)).  Therefore, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166.  The defendants have assumed that Counts I, II, and VI are alleged against the Board, and the Court will accordingly address the arguments concerning the Board

---

[2] Both parties appear to relitigate Count III's failure to train claim.  [Record Nos. 36-1 and 38], The Court dismissed this count in its entirety on November 21, 2019, and will not revisit it here.  [Record No. 29]

on each count. After reviewing the record, the Court agrees that judgment should be entered in favor of the Board on Counts I, II, and VI.

A plaintiff may assert a § 1983 claim against a local government entity, such as a county school board. Courts use a two-pronged analysis to evaluate such claims: (1) whether a deprivation of a constitutional right has been asserted; and (2) whether the school board is responsible for the alleged violation. *Doe v. Claiborne Cty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). Here, the defendants argue that the investigation's constitutionality (*i.e.*, whether or not Boyd and Creteau conducted an "unreasonable search" for the purposes of the Fourth and Fourteenth Amendments) is debatable, but contend that the plaintiffs have offered no evidence to suggest that the second prong is met.

The second prong of the municipal liability analysis is not satisfied when a claim proceeds on a theory of *respondeat superior*, and a plaintiff must instead allege that the school board itself is the wrongdoer. *Claiborne Cty.*, 103 F.3d at 507 (citing *Collins*, 503 U.S. at 122; *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978)). Further, a school board "cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Claiborne Cty.*, 103 F.3d at 507 (citing *Monell*, 436 U.S. at 690-91).

The plaintiff has not briefed or explained the deliberate indifference allegations in any regard, as her response to the motion for summary judgment on the federal claims addresses only one claim levelled against the Board: the previously-dismissed failure to train claim alleged in Count III. [Record No. 38, pp. 4-8] Still, the deliberate indifference claims would

logically proceed on the theory that the Board tolerated school personnel's unconstitutional searches of schoolchildren suspected to be the victims of abuse at home. *See Claiborne Cty.*, 103 F.3d at 507. Such deliberate indifference claims, which are based on the inaction of the Board, would require a showing of: (1) "the existence of a clear and persistent pattern" of similar searches; (2) "notice or constructive on the part of" the Board; (3) the "Board's tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in their failure to act can be said to amount to an official policy of inaction;" and (4) that the "Board's custom was the 'moving force' or direct causal link in the constitutional deprivation." *See Claiborne Cty.*, 103 F.3d at 508 (citations omitted); *K.D. v. Swafford*, 353 F. Supp. 606, 611-612 (E.D. Ky. 2014) (citations omitted).

Assuming, for the sake of argument, that the underlying conduct was unconstitutional (satisfying the first prong of the § 1983 analysis), the record does not comport with these four criteria that speak to the second responsibility-based prong of the analysis in deliberate indifference cases. As the defendants contend, there is no indication that there was a clear and persistent pattern of investigations similar to those that Boyd and Creteau conducted in the Clark County public school system. [Record No. 36-1, pp. 7-11] And even if there was such evidence, there is no suggestion that such a custom was tacitly accepted by the Board such that there was an unofficial policy of inaction that directly caused Boyd and Creteau to investigate the S.T.O.P. tip by asking K.K. to lift up or pull down articles of clothing. Instead, the record suggests that Hollon directed school personnel to investigate the tip, and they exercised discretion in their method of determining whether K.K. showed signs of abuse. Therefore, summary judgment will be entered in favor of the Board itself and Boyd and Creteau in their

official capacities on Counts I (to the extent it alleges deliberate indifference of Fourth Amendment violations), II, and VI.

It is also possible Count I asserts that the conduct at issue was an unconstitutional search actually sanctioned by official Board policy. But if this is what K.K. actually alleges, the claim would also fail on prong two of the municipal liability analysis. K.K. has submitted Clark County Board of Education Policy 09.436, which outlines restrictions on searches and seizures. [Record No. 38-3] The policy states: "No pupil's outer clothing, pockets, or his or her personal effects . . . shall be searched by authorized school personnel unless there are reasonable grounds to believe the search will reveal evidence that the pupil has violated or is violating either a school rule or the law." [Record No. 38-3, p. 1 (citing KRS §§ 161.180, 531.335; *Safford Unified School Dist. No. 1 v. Redding*, 129 S. Ct. 2633 (2009); *New Jersey v. T.L.O.*, 105 S. Ct. 733 (1985)).] It further imposes restrictions and guidelines for searches of a student's person or effects when reasonable suspicion exists. [*Id.*] Policy 09.436 appears to address circumstances like the one at issue when Boyd and Creteau asked K.K. to uncover parts of her person. It limits such searches involving students' clothing to circumstances where school officials have reason to believe that *a student* has violated a school rule or the law. The conduct at issue here, therefore, was unauthorized, regardless of whether it was an unreasonable search for the purposes of the Fourth Amendment.

K.K. cannot proceed under Count I based upon a theory that school personnel acted according to an official Board policy or a theory of deliberate indifference. Thus, summary judgment will be entered in favor of the Board.

**B.      Boyd and Creteau are Entitled to Qualified Immunity on the Federal Claims Asserted Against Them in Their Individual Capacities.**

K.K. alleges the same three federal claims against Boyd and Creteau in their individual capacities: the § 1983 claim for violation of the Fourth Amendment (Count I); the § 1983 claim for deliberate indifference in violation of the Fourteenth Amendment (Count II); and another deliberate indifference § 1983 claim for violation of her constitutional rights. The defendants are entitled to qualified immunity on these claims.

Although plaintiffs may generally sue government personnel acting under color of state law in their individual capacities using § 1983, "the doctrine of qualified immunity shields officials from liability 'insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (citing *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013)). "After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity." *Barton v. Martin*, —F.3d—, No. 18-1614, 2020 WL 595981, at *4 (6th Cir. 2020) (citing *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)).

A qualified immunity analysis requires another two-prong inquiry: (1) whether a constitutional right has been violated; and (2) whether that right was clearly established at the time of a defendant's offending conduct. *Hearring*, 712 F.3d at 279 (citations omitted). Courts have the discretion to address the second prong before the first if it is evident that any constitutional right that may have been violated was not clearly established. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). When this is the case and the first prong will have no effect on the applicability of immunity, courts may assume that a violation has occurred without addressing whether the plaintiff's rights were, in fact, violated. *Id.* (citing

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011); *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009)).

Generally, under the second prong of this analysis, "[a] right is clearly established if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hearring*, 712 F.3d at 279 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (citing *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009)). "While there need not be 'a case directly on point' for the law to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Barton*, 2020 WL 595981, at *4 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Out-of-circuit precedent will only demonstrate that a right is clearly established in "'extraordinary case[s]' when the out-of-circuit decisions 'both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.'" *Hearring*, 712 F.3d at 282 (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988)) (citation omitted).

Assuming that Boyd and Creteau conducted an unreasonable search or were deliberately indifferent to K.K.'s constitutional rights, K.K. has failed to show that her rights to be free of such conduct in these circumstances were clearly established. The Supreme Court and the Sixth Circuit have held school strip searches to be unconstitutional in some instances. But unlike K.K.'s suit, these cases tend to focus on the reasonableness of searches conducted to determine whether students have committed a crime or possessed contraband. *E.g.*, *Safford Unified School Dist. #1 v. Redding*, 557 U.S. 364 (2009) (involving a strip search for contraband pain relief pills); *Knisley v. Pike Cty. Joint Vocational School Dist.*, 604 F.3d 977

(6th Cir. 2010) (involving strip searches for allegedly stolen money and a credit card); *Beard v. Whitmore Lake School Dist.*, 402 F.3d 598 (6th Cir. 2005) (involving strip searches for allegedly stolen cash).

The Sixth Circuit clearly indicated in *Hearring* that this line of cases does not control prong two of the qualified immunity analysis when, as here, the search that allegedly violated a plaintiff's constitutional rights was not conducted for the purpose of ascertaining whether the plaintiff had broken the law or possessed contraband. *Hearring*, 712 F.3d at 281-83. In *Hearring*, the plaintiff's mother asserted that the defendant school nurse had violated the her six-year-old daughter's constitutional rights by examining her genital area in response to the student's complaints about irritation. *Id.* at 277-78. The Sixth Circuit declined to determine whether a constitutional violation had occurred but found that the nurse had qualified immunity because the applicable precedent on strip searches did not demonstrate that any right to be free of such a medical examination was clearly established. *Id.* at 281-83.

Here, the defendants' conduct was aimed at investigating whether K.K.'s body evidenced signs of physical abuse. The plaintiff has not cited any precedent addressing such searches and it does not appear, based on *Hearring*, that the Court should find a clearly established right to be free from the defendants' conduct because it was not undertaken to determine whether K.K. had committed a crime or possessed contraband.

Further, as the defendants point out, it appears that only one other circuit has found there to be a constitutional violation when state personnel examine schoolchildren's bodies to assess allegations of child abuse. *See Tenenbaum v. Williams*, 193 F.3d 581, 606 (2d Cir. 1999). Others have found that similarly-situated defendants are entitled to qualified immunity because there was no clearly established law on the matter without explicitly considering

whether constitutional violations occurred. *E.g.*, *Doe v. Woodward*, 912 F.3d 1278, 1293-96 (8th Cir. 2019); *Landstrom v. Illinois Dept. of Children and Family Services*, 892 F.2d 670, 675-78 (7th Cir. 1990). There is no consensus on this issue that would "leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting," and even if there was, it would not be "clearly foreshadowed" by Sixth Circuit authority. *Hearring*, 712 F.3d at 282. Therefore, out-of-circuit precedent fails to show that Boyd and Creteau are not entitled to qualified immunity.

To the extent K.K. asserts that Policy 09.436 was clearly established at the time of the incident [Record No. 38, pp. 9-10], the assertion misconstrues prong two of the immunity analysis. The second prong, in this instance, requires the Court to determine whether an allegedly violated constitutional right was clearly established at the time of the incident in question. And here, specifically, it asks whether schoolchildren had a clearly established *constitutional* right in October 2018 to be free of the means Boyd and Creteau employed to investigate the S.T.O.P. tip. The conduct's impropriety under Board policy does not impact whether a constitutional right was clearly established.

As noted previously, the Court may address the second prong of the immunity analysis before the first, and in this case it is clear that K.K. has failed to carry her burden and demonstrate that Boyd and Creteau's actions violated a clearly established constitutional right. The caselaw also suggests that no right was clearly established. Thus, the defendants are entitled to qualified immunity on the federal claims asserted against them in their individual capacities.

# IV.

Boyd and Creteau's other pending motion for partial summary judgment contends they are entitled to judgment on all state law claims asserted against them. [Record No. 31] K.K. has failed to respond to the motion for partial summary judgment on the state law counts. Nevertheless, the Court has considered the record and the defendants' arguments and agrees that summary judgment is appropriate on the remaining state law claims set out in First Count IV, Second Count IV, and Count V.

### A. No Cause of Action Exists for the Alleged Violation of Sections 2 and 3 of the Kentucky Constitution.

K.K. asserts that the defendants violated Sections 2 and 3 of the Constitution of Kentucky.[3] [Record No. 1, p. 6] But as the defendants correctly argue, "Kentucky law does not recognize a cause of action for alleged violations of Kentucky constitutional rights." *Faul v. Bd. of Educ.*, No. 5:12-CV-277-KSF, 2013 WL 1511746, at *3 (E.D. Ky. Apr. 9, 2013) (citing *St. Luke Hospital, Inc. v. Straub*, 354 S.W.3d 529, 536-7 (Ky. 2011)). Kentucky Revised Statutes ("KRS") § 446.070, which codifies the common law doctrine of negligence *per se*, does not grant would-be plaintiffs a right of action for constitutional violations like § 1983 provides in the federal context. *St. Luke Hospital, Inc.*, 354 S.W.3d at 534-36. Further, the Supreme Court of Kentucky has declined to recognize a common law equivalent to a federal *Bivens* claim. *Id.* at 536-38.

Generally speaking, plaintiffs who believe their Kentucky constitutional rights have been violated may attempt to remedy the alleged injuries by filing traditional tort actions. *Id.*

---

[3] The Complaint alleges violations of "Articles" 2 and 3 [Record No. 1, p. 6], but the Constitution of Kentucky refers to these provisions as "Sections." *See* Ky. Const. §§ 2, 3.

at 538. That was true in *St. Luke Hospital, Inc.*, where the plaintiff pursued four non-constitutional tort theories of recovery, *id.* at 537-38, and it is true in this case where K.K. asserts a host of state law tort actions against the defendants. Accordingly, the defendants are entitled to judgment as a matter of law on the First Count IV's claims for violations of Sections 2 and 3 of the Constitution of Kentucky.

### B. The State Tort Law Claims

#### 1. Boyd and Creteau are Not Entitled to Qualified Official Immunity on the Tort Law Claims.

K.K. alleges various state law tort claims against Boyd and Creteau in their individual capacities, including: common law negligence (First Count IV), invasion of privacy (First Count IV), "grossly negligent" infliction of emotional distress (Second Count IV), and intentional infliction of emotional distress.[4] [Record No. 1, pp. 5-7] Boyd and Creteau are not entitled to qualified official immunity on these claims under Kentucky law and can be subjected to suit.

In Kentucky, "'[o]fficial immunity' is immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions." *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). "[W]hen sued in their individual capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Id.* at 522 (citation omitted). Courts have recently clarified that qualified official immunity

---

[4] The First Count IV's heading also accounts for "State Law Claims." [Record No. 1, p. 5] K.K. does not explain this phrase. The count, however, alleges violations of the Constitution of Kentucky (discussed above) and tort claims, all of which are "state law claims." The Court construes "State Law Claims" as a description of the state law causes of action that are actually alleged within the substantive text of the First Count IV.

can block liability for intentional torts as well as those based in negligence. *Gati v. Western Kentucky Univ.*, 762 F. App'x 246, 253 (6th Cir. 2019) (citing *Martin v. O'Daniel*, 507 S.W.3d 1, 5-6 (Ky. 2016); *Mosley v. Brock*, No. 2016-CA-001020-MR, 2018 WL 4849714, at *6 (Ky. Ct. App. Oct. 5, 2018)).

Qualified official immunity for Kentucky tort claims applies when an official performs: "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero*, 65 S.W.3d at 522 (citations omitted)." Immunity's applicability often hinges on whether the underlying conduct at issue was discretionary or ministerial. A discretionary act "require[s] the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Turner v. Nelson*, 342 S.W.3d 866, 874 (Ky. 2011) (quoting *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010)). A ministerial act (for which there is no immunity) involves "only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involv[es] merely execution of a specific act arising from fixed and designated facts." *Id.* (quoting *Haney*, 311 S.W. 3d at 240 (citing *Yanero*, 65 S.W.3d at 522)) (internal quotation marks omitted). "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523 (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991), *as modified by*, *Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146 (6th Cir. 1995)).

The record indicates that the defendants' course of action was discretionary. [Record No. 31-1, pp. 17-18] Hollon e-mailed various school personnel to look into the S.T.O.P. tip and noted that state social services could not pursue the tip themselves without acknowledgement of abuse or evidence of trauma on the students' bodies. He did not prescribe the means by which Boyd and Creteau should investigate the situation, and it does not appear that they were bound to act in the manner they did. They could have taken K.K.'s word that her father was not abusing her after observing no visible signs of trauma. Instead, they asked her to pull down or roll up various articles of clothing to reveal her portions of her skin. The defendants evidently exercised some discretion when determining the course of investigation.

But Boyd and Creteau have nonetheless failed to establish a *prima facie* showing of qualified official immunity because the evidence suggests that their conduct fell outside the scope of their authority. As noted above, Policy 09.436 appears to only permit searches of students' clothing and persons when school officials have reason to believe that *a student* has broken the law or violated a school rule. Without evidence of another policy or directive that might justify the search of K.K.'s person to investigate potential abusive behavior, this investigation appears to have fallen outside the scope of Boyd and Creteau's authority.

Viewing the evidence in the light most favorable to the nonmovant, it appears that the defendants have failed to bear their initial burden to establish a *prima facie* claim of qualified official immunity. Therefore, the Court will proceed to analyze the defendants' arguments concerning the individual state law claims.

## 2. K.K.'s Common Law Negligence Claim Fails Because the Plaintiff Has Not Shown that the Defendants Breached a Duty of Care.

The Complaint asserts that Boyd and Creteau owed K.K. a duty "to act in conformity with [her] rights under state and federal law." [Record No. 1, p. 3] It then alleges that Boyd and Creteau are liable for common law negligence, without expounding on that allegation. [*Id.* at p. 6] "In any negligence case, it is necessary to show that the defendant failed to discharge a legal duty or conform his conduct to the standard required." *Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991) This claim fails because the plaintiff has not shown that defendants have breached a duty of care. [Record No. 31-1, pp. 7-8]

School personnel generally have an affirmative duty to "take all reasonable steps to prevent foreseeable harm to students." *E.g.*, *Williams v. Kentucky Dept. of Educ.*, 113 S.W.3d 145 (Ky. 2003). In the context of investigating abuse or neglect, this duty is manifested in the duty to report found in KRS § 620.030(1). *Ritchie v. Turner*, 559 S.W.3d 822, 830 (Ky. 2018). KRS § 620.030(1) provides, in relevant part:

> Any person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made to a local law enforcement agency or to the Department of Kentucky State Police, the cabinet or its designated representative, the Commonwealth's attorney, or the county attorney by telephone or otherwise.

KRS § 620.030(1). Of course, there will always be some question regarding when someone "knows or has reasonable cause to believe" that such abuse has occurred, and school officials must accordingly make a "baseline determination" whether this statutory duty has been triggered. *Ritchie*, 559 S.W.3d at 838.

The defendants performed the interview in question to determine whether there was sufficient evidence of abuse to report to social services. The duty had not yet been triggered prior to their investigation -- a point reinforced by social services' earlier refusal to act without more information from Hollon. However, the defendants were plainly attempting to determine

whether the duty had been triggered so that they could comply with their statutory obligations, if necessary. And more generally, the facts demonstrate that the defendants were complying with the duty of school custodians to take steps to prevent foreseeable harm from coming to K.K. The plaintiff has failed to refute this argument (or offer any argument regarding common law negligence), and the defendants are entitled to summary judgment on First Count IV's negligence claim.

### 3. K.K. Has Failed to State a Claim for Invasion of Privacy.

The plaintiff has failed to state a claim for invasion of privacy [Record No. 31-1, pp. 9-10] and that claim also will be dismissed with summary judgment entered in the defendants' favor.

While the defendants plainly seek summary judgment, their argument is couched in terms of the plaintiff failing to state a viable claim for relief. At the summary judgment stage, a district court may dismiss a cause of action if the complaint fails to state a claim upon which relief may be granted. *See, e.g.*, *Meyer v. Natole*, No. 18-1509, 2018 WL 8222903, at *3 (6th Cir. Dec. 10, 2018); *Moore v. Carlton*, 929 F.2d 701 (Table), No. 90-5757, 1991 WL 43906, at *1 (6th Cir. 1991). To avoid dismissal, a complaint "must allege sufficient facts which, if accepted as true, state a claim for relief 'that is plausible on its face.'" *Meyer*, 2018 WL 8222903, at *3 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Supreme Court of Kentucky has adopted the Restatement (Second) of Torts' principles for the tort of invasion of privacy. *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981). An invasion of privacy can occur by: "(a) an unreasonable intrusion upon the seclusion of another . . . .; or (b) appropriation of the other's

name or likeness . . . .; or (c) unreasonable publicity given to the other's private life . . . .; or (d) publicity that unreasonably places the other in a false light before the public." *Id.* (quoting Restatement (Second) of Torts § 652A (1976)). Each form of invasion of privacy includes different elements. *Compare Singapore Ministry of Health v. Farrera-Brochez*, No. 5: 19-051-DCR, 2019 WL 6332136, at *2 (E.D. Ky. Nov. 25, 2019) (addressing the elements of a claim for intrusion upon seclusion as set forth in the Restatement (Second) of Torts § 652B (1976)), *with McCall*, 623 S.W.2d at 888 (addressing the elements of a false light claim as set forth in Restatement (Second) of Torts § 652E (1976)).

K.K.'s Complaint alleges invasion of privacy without specifying which form of the tort she asserts. The defendants speculate that the plaintiff may be asserting an intrusion upon seclusion or unreasonable publicity claim, but the Complaint does not attempt to meet the elements of either. [Record Nos. 1, p. 6 and 31-1, pp. 9-10] Instead, it merely offers a conclusory statement that the actions of Boyd and Creteau constitute invasion of privacy. [Record No. 1, p. 6] Because plaintiff has not responded to the defendants' summary judgment arguments concerning the state law claims, she has failed to further explain what is being alleged through this claim. Thus, the plaintiff has failed to state a claim for relief that is plausible on its face and it will be dismissed.

### 4.     K.K.'s Emotional Distress Claims Fail as a Matter of Law.

#### i.     The "Grossly Negligent" Infliction of Emotional Distress Claim (Second Count IV) Will be Construed as a Claim Asserting Intentional Infliction of Emotional Distress.

K.K.'s Second Count IV alleges a "grossly negligent" infliction of emotional distress claim. The Court agrees with Boyd and Creteau that the count should be construed as an intentional infliction of emotional distress ("IIED") claim like Count V.

Kentucky maintains separate common law causes of action for negligent infliction of emotional distress ("NIED") and IIED (sometimes called "outrage"). *Compare Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012) (addressing the elements of a NIED claim), *with Childers v. Geile*, 367 S.W.3d 576 (Ky. 2012) (addressing the proper circumstances for plaintiffs to bring IIED claims). Plaintiffs occasionally plead claims that look like a hybrid of the two causes of action by alleging that gross negligence caused emotional distress. *E.g.*, *T.S. v. Gabbard*, No. 10-217-KSF, 2012 WL 2175791, at *9 (E.D. Ky. Jun 14, 2012); *Lovins v. Hurt*, No. 11-216-JBC, 2011 WL 5592771, at *3 (E.D. Ky. Nov. 16, 2011). Such claims have been construed as IIED (rather than NIED) claims where plaintiffs, like K.K., have failed to clarify which tort they assert. *Lovins*, 2011 WL 5592771, at *3.

Further, as Boyd and Creteau correctly contend, an IIED claim involves intentional or *reckless* conduct. [Record No. 31-1, pp. 11-12 (citing *Gilbert v. Barkes*, 987 S.W.2d 772 (Ky. 1999) (citations omitted)] The grossly negligent infliction of emotional distress claim here (Second Count IV) alleges reckless conduct. [Record No. 1, pp. 6-7] Accordingly, the Court will construe the Second Count IV as a claim for IIED. This IIED claim and the IIED claim explicitly asserted in Count V warrant further analysis.

### ii. Neither the Underlying Conduct, nor the Resulting Distress, Are Sufficient to Sustain an IIED Claim.

The IIED claims fail as a matter of law because, *inter alia*, the alleged conduct at issue was not so outrageous, and the distress not so severe, that K.K. could sustain an IIED claim. [Record No. 31-1, pp. 12-16] Therefore, summary judgment will be entered on both IIED claims (Second Count IV and Count V).

An IIED claim has four elements under Kentucky law:

> (1) the wrongdoer's conduct must be intentional or reckless; (2) the conduct must be outrageous and intolerable in that it offends against generally accepted standards of decency and morality; (3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress must be severe.

*Gilbert*, 987 S.W.2d at 777 (citing *Kroger Co. v. Willgruber, Ky.*, 920 S.W.2d 61, 67 (Ky. 1996); *Craft v. Rice*, 671 S.W.2d, 247, 249 (Ky. 1984)). "[I]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788-89 (Ky. 2004), *overruled on other grounds by Toler v. Süd–Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014) (citing Restatement (Second) of Torts § 46(1), cmt. h (1965)) (citations omitted)). Similarly, the Court acts as a gatekeeper in deciding "'whether on the evidence severe emotional distress can be found' before the jury may determine 'whether, on the evidence, it has in fact existed.'" *Snyder v. Kohl's Dept. Stores, Inc.*, 580 F. App'x 458, 465 (6th Cir. 2014) (quoting Restatement (Second) of Torts § 46 , cmt. j (1965)).

The conduct alleged in a Kentucky IIED claim must clear a "high threshold" of outrageousness. *Lattanzio v. Brunacini*, No. 5: 16-171-DCR, 2018 WL 3421825, at *5 (E.D. Ky. Jul. 13, 2018) (quoting *Stringer*, 151 S.W.3d at 791). Courts look to § 46 of the Restatement (Second) of Torts for guidance on whether underlying conduct meets this threshold. *Stringer*, 151 S.W.3d at 789. Comment d to § 46 provides, in relevant part, that:

> It [is not] enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Restatement (Second) of Torts § 46, cmt. d (1965).

In this case, the conduct does not meet the threshold for outrageousness. Policy 09.436 appears to prohibit the investigatory actions at issue, but as the Restatement indicates, the conduct must be beyond all possible bounds of decency. Even actions performed with malicious or criminal intent may fail to meet this threshold. Here, the means by which Boyd and Creteau decided to investigate were not beyond the bounds of decency. The defendants were attempting to investigate the S.T.O.P. tip to determine whether they needed to report abuse to social services pursuant to KRS § 620.030(1). The Supreme Court of Kentucky has recognized that this situation requires school personnel to conduct such an investigation. *Ritchie*, 559 S.W.3d at 838. Boyd's office door was shut, and the window blinds were closed. Boyd and Creteau did not roll up or pull down any of K.K.'s clothes themselves, and they did not ask K.K. to fully remove any articles of clothing. Additionally, they asked whether she would be comfortable showing them her thighs. And the defendants, like the plaintiff, are females. Looking at the record in its entirety, the conduct was not sufficiently outrageous or intolerable to sustain an IIED claim.

Further, there is little evidence that the claimed emotional distress suffered as a result of the incident was sufficiently severe. To meet this fourth element of IIED, a plaintiff must suffer "substantially more than mere sorrow." *Gilbert*, 987 S.W.2d at 777. Embarrassment is insufficient. *Benningfield v. Pettit Envntl., Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005) (citing *Gilbert*, 987 S.W.2d at 777). Although K.K. feels self-conscious and was no doubt embarrassed by the investigation and subsequent inquiries from her peers, the defendants point to various facts that suggest the severity threshold is not met: the plaintiff's grades did not drop, she has largely returned to a normal schedule, and the incident has not caused her to pursue psychiatric treatment or counseling. [Record No. 31-1, p. 16] These facts indicate that

any emotional distress has been closer to sorrow or embarrassment than the severe emotional distress required by an IIED claim. And again, the plaintiff has not responded to the defendants' motion for summary judgment arguments to refute these cogent points.

Summary judgment appropriate on both IIED counts (Second Count IV, pleaded as grossly negligent infliction of emotional distress, and Count V). The conduct was not sufficiently outrageous, and the distress not sufficiently severe, for K.K. to maintain her IIED claims. Accordingly, summary judgment will be entered in the defendants' favor regarding these claims.

## V.

The defendants are entitled to judgment as a matter of law on all of K.K.'s remaining claims. The § 1983 claims alleged in Counts I, II, and VI against the Board (including those alleged against Boyd and Creteau in their official capacities) fail as a matter of law, and Boyd and Creteau are entitled to qualified immunity in their individual capacities on these same counts. K.K. has no cause of action under Sections 2 and 3 of the Constitution of Kentucky (First Count IV). And while the defendants are not entitled to qualified official immunity under Kentucky law on the plaintiff's state tort claims, they have carried their burden for judgment as a matter of law on the common law negligence (First Count IV), invasion of privacy (First Count IV), and IIED (Second Count IV and Count V) causes of action. Accordingly, it is hereby

**ORDERED** as follows:

1. Defendants Becca Boyd, Kris Creteau, and Clark County Board of Education's motion for partial summary judgment on the remaining federal claims [Record No. 36] is **GRANTED**.

2.     Defendants Boyd and Creteau's motion for partial summary judgment on the remaining state law claims [Record No. 31] is **GRANTED**.

3.     Summary judgment is entered in favor of the defendants.

4.     Plaintiff K.K.'s claims are **DISMISSED** with prejudice.  All claims having been resolved, this action will be **DISMISSED** and **STRICKEN** from the Court's docket.

5.     A corresponding Judgment will be entered this date.

Dated: February 13, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky